COMMONWEALTH vs. DAVID C. CARKHUFF.

Hampden. November 3, 2003. - March 5, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Search and Seizure,* Administrative inspection, Roadblock by police. *Motor Vehicle,* Operating under the influence.

Discussion of the constitutional requirements for administrative searches. [124-129]
Where State police, in order to thwart a possible terrorist attack on a reservoir, stopped all vehicles traveling on a road alongside the reservoir, the suspicionless stop of the defendant failed to meet the standards required of a constitutionally permissible administrative search, in that, in the absence of any prior notice or warning to motorists, the State police failed to minimize the intrusiveness of the stop and search procedures. [129-130]

COMPLAINT received and sworn to in the Westfield Division of the District Court Department on October 15, 2001.

A pretrial motion to suppress evidence was heard by *David S. Ross,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Sosman,* J. in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her.

*Katherine E. McMahon,* Assistant District Attorney, for the Commonwealth.

*William C. Newman (John Reinstein & Ryan E. Alekman* with him) for the defendant.

SOSMAN, J. The Commonwealth appeals from an order allowing the defendant's motion to suppress evidence obtained when his vehicle was stopped by a State trooper while traveling past the Cobble Mountain Reservoir. After stopping the defendant, the trooper observed indicia of intoxication and arrested the defendant for operation of a motor vehicle while under the influence of intoxicating liquor. The defendant moved to suppress all evidence obtained as a result of the stop on the ground

that it violated both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. In response to the motion, the Commonwealth claimed that a heightened security alert in the immediate aftermath of the events of September 11, 2001, justified the stop of all motorists passing by Cobble Mountain Reservoir in order to prevent any terrorist attack that might contaminate or disrupt the water supply, and that the suspicionless stop of the defendant as he was driving past the reservoir was therefore "reasonable." Finding various defects in the Commonwealth's proposed justification for the stop, the judge ordered the suppression of all evidence obtained as a result of the stop. A single justice of this court allowed the Commonwealth leave to appeal and designated that the appeal would be heard by this court. For the following reasons, we affirm the order of suppression.

1. *Facts.* The judge found the following facts, amplified by uncontested testimony at the evidentiary hearing. See *Commonwealth* v. *Willis*, 415 Mass. 814, 816 n.2 (1993). The Cobble Mountain Reservoir, located in the towns of Blandford and Granville, supplies fresh water for various municipalities, including the city of Springfield. A public way, known as Cobble Mountain Road, runs alongside a portion of the reservoir's shoreline for an unspecified distance. The road, a narrow "back country" road (just barely wide enough for two vehicles to pass), connects to other public ways at either end. Posted signs advise motorists that they are not permitted to stop alongside the reservoir, and that no trespassing is allowed. The area is rural, and the road carries very little traffic.[1]

Approximately one month after the terrorist attacks of September 11, 2001, Federal authorities issued a written advisory to law enforcement agencies, including the Massachusetts State police, warning that there was a "credible threat" of an impending attack on the United States. No geographic location, specific target, or type of target was identified. In response to that advisory, the State police decided

---

[1]At the hearing, the trooper who normally patrolled the road during the 11 P.M. to 7 A.M. shift testified that he had never seen more than three vehicles go by during that eight-hour period.

to heighten security around the Cobble Mountain Reservoir.[2] Their intent was to guard against contamination of the water in the reservoir, sabotage of the pumping station (which would cut off the water supply to many municipalities), or destruction of the dam in Blandford (which would cause the reservoir waters to flood surrounding communities). Troopers were assigned to the area, with instructions to stop all persons traveling alongside the reservoir and make inquiry as to their reasons for being there. If the stopped vehicle was a tanker truck or box truck, the troopers were to search it, including any locked compartments.

At around 2 A.M. on October 15, a day or two after these security procedures had been implemented, Trooper Richard Gawron was in his marked cruiser located near the reservoir dam in Blandford. Another trooper was approximately one-quarter mile away, in the area of the pumping station. When Trooper Gawron saw a vehicle approaching, he activated his blue lights, got out of the cruiser, and held up his hand, signaling the driver to stop. The approaching vehicle, a passenger sedan, stopped approximately one hundred feet away. Trooper Gawron signaled for the vehicle to come closer. The vehicle accelerated rapidly and was continuing on by when Trooper Gawron again signaled and yelled at the driver to stop. The vehicle stopped, and Trooper Gawron made inquiry of the driver (the sole occupant of the vehicle), later identified as the defendant, David Carkhuff. During that conversation, the defendant exhibited signs of intoxication, and Trooper Gawron administered field sobriety tests. When the defendant failed those tests, he was arrested and subsequently charged with operating while under the influence of intoxicating liquor. Prior to stopping the defendant, Trooper Gawron had not observed anything suspicious about the defendant or his vehicle.

2. *Discussion.* The Commonwealth has conceded, as it must, that the stop of the defendant's vehicle constituted a "seizure," see *Commonwealth* v. *Rodriguez*, 430 Mass. 577, 579 (2000),

[2]Security was also increased at the Quabbin Reservoir. Shortly before the advisory, an object had fallen or been dropped from an airplane and had landed in the Quabbin Reservoir. According to the trooper who testified at the evidentiary hearing, that object "turned out to be innocuous," but the incident had alerted law enforcement to "issues regarding water supply and safety."

and cases cited, and that the trooper had no articulable suspicion concerning the defendant or his vehicle that would justify a *Terry* stop. *Terry* v. *Ohio*, 392 U.S. 1 (1968). The Commonwealth also concedes that the directive to stop vehicles on Cobble Mountain Road would not satisfy the requirements for a constitutionally permissible roadblock (as Trooper Gawron's testimony confirmed that there was no roadblock plan). See *Commonwealth* v. *Trumble*, 396 Mass. 81, 86-87 (1985); *Commonwealth* v. *McGeoghegan*, 389 Mass. 137, 143 (1983). Instead, the Commonwealth asks that we analogize the present case to other types of permissible suspicionless searches, contending that the need to thwart a terrorist attack on the reservoir outweighs the allegedly slight intrusion of a brief stop of each passing motorist and that the stop therefore qualifies as "reasonable." In most respects, the stopping of all vehicles on Cobble Mountain Road was the equivalent of a roadblock and, as the Commonwealth acknowledges, that roadblock did not pass constitutional muster. Where a roadblock does not meet constitutional requirements, we may not ignore those requirements and begin anew with an alternative generic analysis of whether the roadblock stop was "reasonable."

The Commonwealth's brief also analogizes the stop in the present case to the security checks that are now routinely performed at such places as airports, court houses, and military installations. See *Commonwealth* v. *Harris*, 383 Mass. 655 (1981); *United States* v. *Edwards*, 498 F.2d 496 (2d Cir. 1974); *United States* v. *Davis*, 482 F.2d 893 (9th Cir. 1973); *United States* v. *Miles*, 480 F.2d 1217 (9th Cir. 1973). Based on justifiable concern about the vulnerability of such facilities, the search and seizure protocols at those facilities are designed to assure that persons entering do not have the means to destroy those facilities or to disrupt their operation. Here, the articulated concern was that terrorists would attempt to contaminate the drinking water, cut off the water supply, or start a flood by destroying the dam. In order to protect that critical resource, the procedures implemented by the State police were designed to intercept all persons coming by the reservoir, ascertain their reason for being there, and, if their vehicles were of a kind that could carry a large quantity of some form of toxin or contami-

nant, search the vehicles. At least in concept, the screening of all persons approaching the reservoir is similar to the screening of persons and property entering other vulnerable facilities. There is a vast body of case law concerning such screening procedures, see generally 4 W.R. LaFave, Search and Seizure §§ 10.6 & 10.7 (3d ed. 1996 & Supp. 2004), and it provides a framework for analyzing the Commonwealth's claim that the stopping of motorists along the reservoir constituted a permissible screening procedure. For the following reasons, we conclude that this seizure fails to comport with the requirements set forth in those cases.[3]

Such screening searches, referred to in some cases as "administrative searches,"[4] must be conducted as part of a scheme that has as its purpose something "other than the gathering of evidence for criminal prosecutions." *Commonwealth* v. *Harris, supra* at 657, quoting *McMorris* v. *Alioto*, 567 F.2d 897, 899 (9th Cir. 1978). Thus, for example, the purpose of preboarding screening searches at airports is "to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings. The essential purpose of the scheme is not to detect weapons or explosives or to apprehend those who carry them, but to deter persons carrying such material from seeking to board at all." *United States* v. *Davis, supra* at 908. See *State* v. *Plante*, 134 N.H. 585, 588, cert. denied, 502 U.S.

---

[3]The United States Supreme Court has not directly addressed the analysis to be applied to such screening procedures under the Fourth Amendment to the United States Constitution, but has impliedly recognized their validity. See *Chandler* v. *Miller*, 520 U.S. 305, 323 (1997) ("where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable' — for example, searches now routine at airports and at entrances to courts and other official buildings"). Lacking definitive guidance as to Fourth Amendment requirements in this specific context, the requirements we impose today are grounded in art. 14 of the Massachusetts Declaration of Rights.

[4]For this particular defendant, there was only a seizure, not a search. The troopers were stopping all vehicles to make inquiry of the drivers, but the only vehicles being searched were certain types of trucks. This defendant, traveling in a passenger car, was therefore not subject to any search. In that sense, the case presents an "administrative seizure" rather than an "administrative search." That this defendant was only subjected to the seizure mandated by the security measures, and not to any subsequent search, does not affect the requirements under which the constitutionality of those measures are to be judged.

984 (1991) (purpose of administrative search at court house entry "is to deter individuals from bringing dangerous weapons into courthouses"). A similar purpose is at issue in the present case, namely, preventing potential terrorist saboteurs from contaminating or interrupting the water supply by keeping them away from the reservoir in the first place.[5] The purpose of these procedures thus satisfies that threshold requirement for a lawful administrative search.

An administrative search must also be "reasonable" in the sense that it "must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it." *United States* v. *Davis, supra* at 910. See *Commonwealth* v. *Harris, supra,* quoting *McMorris* v. *Alioto, supra* (administrative search "must be limited and no more intrusive than necessary to protect against the danger to be avoided").[6] On this aspect of the inquiry, the question is whether the govern-

[5]The defendant contends that the State police did not have an adequate basis on which to conclude that any terrorist threat was directed at Cobble Mountain Reservoir. Administrative searches, however, are not justified by reference to a specific threat directed at a particular facility. See 4 W.R. LaFave, Search and Seizure § 10.7(a), at 651 (3d ed. 1996) (court house screening procedures do not require "a building-by-building showing of the risk of bombing, any more than the hijacker detection program requires an airport-by-airport showing of the risk of hijacking"). Rather, based on prior experience with terrorism or violence, some types of facilities have been identified as particularly susceptible to attack, and officials may then take steps to prevent such attacks from occurring at other, similar facilities. Here, the Commonwealth contends that contamination or disruption of the water supply has been used as an enemy tactic throughout history such that it is logical and reasonable to identify reservoirs as likely targets of terrorist attack. See 42 U.S.C. § 300i-2 (2002) (requiring community water systems to assess their vulnerability to terrorist attack and develop emergency response plan). Because we conclude that the security measures implemented here fail other requirements for a lawful administrative search, we will assume, without deciding, that the State police had an adequate basis for implementing some form of administrative search procedure to protect the reservoir.

[6]The Commonwealth contends that, when analyzing the "reasonableness" of a search or seizure, it need not engage in an assessment of "less intrusive alternatives." See *Commonwealth* v. *Shields,* 402 Mass. 162, 165-166 (1988). That simply means that the government does not need a substitute alternative for the stop or seizure itself — it may be reasonable to conduct a search even if other methods, short of a search, might be available to address the government's objective. See *Michigan Dep't of State Police* v. *Sitz,* 496 U.S. 444, 453 (1990) (not up to courts to decide "which among reasonable alternative law enforcement techniques should be employed to deal with a serious

ment can implement measures to reduce the intrusiveness of the search without compromising the legitimate administrative goal. Thus, where the risk to be avoided by the administrative search is extreme (as it is with airplane hijackings, for example), an administrative search can have the objective of stopping all terrorists (not just most terrorists) from entering a vulnerable facility or location. See 4 W.R. LaFave, *supra* at § 10.6(c). The issue, then, is what steps to protect the privacy interests of ordinary persons can reasonably be incorporated into stop, search, or screening procedures that will minimize the intrusion on those privacy interests while still preventing access to all terrorists.

In upholding administrative searches at airports and court houses, courts have identified various features that operate to minimize the intrusiveness of those screening procedures. One such feature is prior notice of the search, usually achieved by conspicuous posting of signs warning persons that they will be subject to search if they proceed past a certain point, and reinforced by the obvious presence of a metal detector and related equipment and personnel. Prior notice minimizes intrusiveness in various ways. First and foremost, it allows the traveler (or court house visitor) to avoid the search entirely by electing not to board the aircraft (or enter the court house). See *United States* v. *Davis, supra*; 4 W.R. LaFave, *supra*.[7] Prior notice also serves to reduce the fright or alarm that would otherwise be experienced. See *Commonwealth* v. *Harris*, 383

public danger"). However, it remains as part of our jurisprudence on administrative searches that the search itself be conducted in a manner that minimizes intrusiveness. See *Commonwealth* v. *Harris*, 383 Mass. 655, 657 (1981). Thus, in the present case, we are not suppressing the evidence from this seizure due to the existence of alternatives that might have avoided any seizure (e.g., the alternative of simply following every vehicle to make sure it did not stop alongside the reservoir). Rather, we address whether, given a legitimate administrative basis for a seizure, something more could have been done to reduce the intrusiveness of the seizure itself.

[7]Some courts have opined that prior notice of screening procedures and an opportunity to turn away means that travelers and court house visitors have given "consent" or "implied consent" to those procedures. See, e.g., *Mc-Morris* v. *Alioto*, 567 F.2d 897, 901 (9th Cir. 1978); *State* v. *Rexroat*, 266 Kan. 50, 54-55 (1998). In *Commonwealth* v. *Harris*, 383 Mass. 655, 657 (1981), we recognized that "elements of coercion were inherent in the situation" confronting a court house visitor, such that the security search would not qualify as a "consent" search. Rather than treating the screening process as a consensual search, we noted that advance notice, and the subsequent voluntary submis-

Mass. 655, 656 & n.1, 657 (1981) (where posted sign advised public of search procedures at court house entry, search "could not have been a surprise" to defendant); *United States* v. *Albarado*, 495 F.2d 799, 806 (2d Cir. 1974) (where "[s]igns warn passengers of [metal detector], and the machine is obvious to the eye," its use does not "annoy, frighten or humiliate" person being screened); *People* v. *Hyde*, 12 Cal. 3d 158, 176 (1974) (Wright, C.J., concurring) (notice of airport screening procedures "enables the individual to avoid the embarrassment and psychological dislocation that a surprise search causes").[8]

Here, nothing was done to warn motorists traveling along Cobble Mountain Road that they would be subject to any stop and search. There were signs advising them that trespassing was not allowed, and that they should not stop along that stretch of road, but nothing advised them that they would be stopped by police. Nor was there any readily identifiable checkpoint or station that would, in at least a general way, convey the sense that all vehicles were being stopped. As such, persons who did not wish an encounter with the police had no opportunity to turn back and use an alternative route away from the reservoir. And, lacking any prior warning, the sudden activation of blue lights and the order to stop would come as a complete surprise to a law-abiding motorist using Cobble Mountain Road, engendering all of the apprehension and anxiety that an unexpected stop entails.

The giving of some form of prior notice to motorists would not have compromised the government's objectives here — as with airport and court house entry searches, the objective of preventing dangerous persons from gaining access is still ac-

---

sion to the search procedures, "reduced the intrusiveness" of those procedures. *Id.*

[8]While we have not held that advance notice is an automatic constitutional requirement for a lawful roadblock, see *Commonwealth* v. *Amaral*, 398 Mass. 98, 100 (1986), the advantages of giving notice have repeatedly been recognized in that context. See *Delaware* v. *Prouse*, 440 U.S. 648, 657 (1979), quoting *United States* v. *Ortiz*, 422 U.S. 891, 895 (1975) (where motorist approaches apparent roadblock and can see other vehicles being stopped, "he is much less likely to be frightened or annoyed by the intrusion"); *Commonwealth* v. *McGeoghegan*, 389 Mass. 137, 143 (1983) (advance notice of roadblock "would have the virtue of reducing surprise, fear, and inconvenience"). Here, what is required is that all reasonable steps be taken to minimize the intrusion, and it will often (but perhaps not always) be the case that advance notice is one of those reasonable steps.

complished if the person simply turns back rather than submit to the stop or search. Again, where the objective of a proper administrative search is prevention, not apprehension of criminals, the giving of notice operates to reduce the intrusiveness of the subsequent stop or search without undermining the government's legitimate objective.[9]

Thus, in the absence of any prior notice or warning to motorists, the State police failed to minimize the intrusiveness of the stop and search procedures at the reservoir. On that basis alone, the suspicionless stop of vehicles along Cobble Mountain Road fails to meet the standards required of a constitutionally permissible administrative search.[10]

We recognize that this particular stop occurred in the immediate aftermath of the terrorist attacks of September 11, 2001, and that the State police were responding to warnings concerning further threatened attacks. While we accept the fact that ongoing attempts by terrorists to inflict further death and devastation on our population may increase the number and nature of facilities and locations that must be protected by heightened security screenings (see note 5, *supra*), that does not affect the requirement that suspicionless stops and searches at those facilities and locations must still be conducted in a manner that minimizes the intrusion experienced by the many ordinary, law-abiding persons being screened. The fact that the stop itself is brief, and thus, in the Commonwealth's view, a relatively minor intrusion, does not suffice. When, as part of an administrative search, the police seek to stop, question, and potentially to search persons as to whom they have no articulable suspicion of wrongdoing, they must take all reasonable steps to reduce the intrusiveness of that encounter.

We therefore affirm the order of suppression.

*So ordered.*

---

[9]The Commonwealth did not even attempt to establish that it would have been impossible or burdensome to provide notice. A sign posted at each end of the stretch of roadway that runs along the reservoir would have sufficed to alert motorists that they would be stopped, and at least temporary signs could have been hastily erected.

[10]We need not address whether other steps, if any, beyond the provision of notice would be required to reduce the intrusiveness of the stop and search procedures implemented at the reservoir. Nor do we need to address any other defects in these procedures alleged by the defendant or identified by the judge.