927 So.2d 1 (2006)
C.N.H., a Child, Appellant,
v.
STATE of Florida, Appellee.
No. 5D05-1392.
District Court of Appeal of Florida, Fifth District.
February 17, 2006.
As Amended on Grant of Rehearing April 13, 2006.
*2 James B. Gibson, Public Defender, and David S. Morgan, Assistant Public Defender, Daytona Beach, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Mary G. Jolley, Assistant Attorney General, Daytona Beach, for Appellee.
SHARP, W., J.
C.N.H. appeals[1] an order of disposition placing her on probation after the trial court denied her ore tenus motion to suppress evidence when a routine suspicionless search of her purse at the alternative school she attended revealed a knife. In denying the motion the trial court determined that the suspicionless search was a proper administrative search. C.N.H. entered a plea of no contest to one charge of possession of a weapon on school property. She argues on appeal that the search of her person and possessions violated her constitutional right to be free from unreasonable searches under the Fourth Amendment to the U.S. Constitution. We disagree and affirm.
C.N.H. was a student at Cornerstone Complex (Cornerstone), also known as "New Beginnings," an alternative middle school. Alternative schools are not the equivalent of regular public schools.[2] Rather, alternative schools are "wake-up" schools; they are "high risk" schools. Students are sent to alternative schools before they are actually confined and in lieu of being confined. Virtually all of the children attending Cornerstone are court-ordered to do so, and thus are not eligible to attend a regular public school.
Cornerstone has a policy of conducting daily suspicionless pat-down searches of every student every morning before they are permitted to go to their classes. Female students have their purses searched as well. The students are well aware that they will be searched daily. The school *3 has adopted this policy, because as an alternative school, the nature of its student population differs markedly from that of a regular school, and it is necessary for school personnel to look for weapons, drugs and similar items to prevent them from entering the school, and to ensure the safety of the students and Cornerstone's personnel. The searches are conducted to deter students from bringing drugs and weapons into the school.
On December 7, 2004, C.N.H. was routinely searched after she got off the school bus. A long blade knife was found in her purse.
The state attorney filed a Petition for Delinquency, charging C.N.H. with violations of sections 790.115(2)(a) and (b), for willfully and knowingly possessing a knife while on school property. The defense filed two motions to suppress, arguing that the search and seizure was not performed in compliance with section 901.151, because school personnel had no reasonable suspicion that C.N.H. had committed, was committing, or was about to commit a criminal violation, or a violation of the rules of Cornerstone.
On appeal, C.N.H. argues that school children do not shed their constitutional rights when they enter the schoolhouse, Board of Education of Independent School Dist. No. 92 of Pottawatomie County v. Earls, 536 U.S. 822, 829, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002); and reasonable suspicion is required before a student may be searched. See A.H. v. State, 846 So.2d 1215, 1216 (Fla. 5th DCA 2003), citing New Jersey v. T.L.O., 469 U.S. 325, 341-342, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); A.N.H. v. State, 832 So.2d 170 (Fla. 3d DCA 2002).
Administrative Searches. The United States Supreme Court has held that suspicionless administrative searches of students are proper under certain circumstances. See Earls (approved policy requiring students engaged in competitive extracurricular activities to undergo drug urinalysis testing); Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)(approved random drug urinalysis testing policy for student athletes).
Moreover, administrative searches differ from traditional criminal searches. The Fourth Amendment only applies where the object of the search is to penalize, which is not the case with an administrative search. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Instead, an administrative search is characterized as involving a "program" of inspections, Edmond v. Goldsmith, 183 F.3d 659, 663 (7th Cir. 1999); or a screening search, Commonwealth v. Carkhuff, 441 Mass. 122, 804 N.E.2d 317 (2004), and is proper when conducted as part of a scheme whose purpose is something other than gathering evidence for criminal prosecution.[3]See Carkhuff; Commonwealth v. Harris, 383 Mass. 655, 421 N.E.2d 447 (1981).
Thus, administrative searches are authorized without the same safeguards that are normally required by the Fourth Amendment on the theory that the object of the search is not to penalize. But the discovery of criminal acts or evidence in the course of a proper administrative searches does not render the search illegal. New York v. Burger, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987).
*4 With an administrative search, the warrant and probable cause showing is replaced by the requirement to show a neutral plan for execution; a compelling governmental need; the absence of less restrictive alternatives; and reduced privacy rights. See Camara; Shelton v. Gudmanson, 934 F.Supp. 1048, 1050 (W.D.Wis. 1996). A balance of interests approach is utilized by courts in such cases. Shelton v. Gudmanson.
The third district discussed student administrative search cases in State v. J.A., 679 So.2d 316 (Fla. 3d DCA 1996). In J.A., the Dade County School Board adopted a policy authorizing random searches of students in high school classrooms with hand-held metal detector wands. The searches were conducted pursuant to established guidelines, and an independent security firm was hired to execute the searches. Search teams arrived at a randomly selected secondary school, and the roll of dice determined which sector and classroom the team would search. Signs were posted throughout the school which informed the students that random searches are conducted. During the search, students were scanned with the metal detector wand and if the presence of metal was detected on a student, he or she was patted down. A student could refuse to be searched, but was subject to discipline.
The third district noted that the random, suspicionless, administrative search of public high school students in that case was in furtherance of a valid administrative purpose. The court noted that "[j]udges cannot ignore what everybody else knows: violence and the threat of violence are present in public schools" and "[s]chool-children are harming each other with regularity," citing People v. Pruitt, 278 Ill. App.3d 194, 214 Ill.Dec. 974, 662 N.E.2d 540, 546 (1996). The court also observed that:
The incidences of violence in our schools have reached alarming proportions. In the year prior to the Board's implementation of the search policy, Dade County Public Schools reported both homicides and aggravated batteries as well as the confiscation from students of a very high number of weapons, including handguns.
J.A., at 319. A balance between the student's expectations of privacy and the schools need to maintain an environment in which learning can take place, must be made. J.A.
The legality of a search depends on its reasonableness, under all circumstances. J.A. The court should consider the students' privacy interest, the nature of the search, and the severity of need met by the search. J.A. Public school students are subject to a greater degree of control and administrative supervision than an adult because of the state's custodial and tutorial authority over the student. Students within a school environment have a lesser expectation of privacy than members of the general population, and they may waive a portion of their privacy rights in exchange for, or in lieu of something else. J.A. See also Vernonia (approved random drug urinalysis testing policy for student athletes).
Administrative Search In this Case. The students at Cornerstone waived a portion of their privacy rights in exchange for, or in lieu of, confinement. Because of the status of the students, they enjoyed an even greater reduction in privacy rights than those afforded students enrolled in regular public schools. Camera. Further, alternative schools have an even greater need to maintain discipline and safety for the protection of students and staff, and create a healthy learning environment, than regular public schools based on the nature of their student population.
*5 Neutral Plan for Execution. Cornerstone's plan for even-handed daily searches of all of the students and their purses, constitutes a neutral plan for the execution of the searches. The students are aware of the searches and can claim no surprise that one is conducted or that the school might discover contraband.
Compelling Governmental Interest or Need. We also find that Cornerstone has a compelling governmental interest in conducting these searches which is at least equal to that found in J.A. Assuring the safety of the students and its staff, and keeping drugs and weapons out of the classroom to ensure an atmosphere conducive to learning[4] in an alternative school is a more difficult and imperative task due to the nature of the student population. The alternative would result in an undisciplined and dangerous environment, which would make it virtually impossible for Cornerstone to accomplish its goals with regard to the students.
Absence of Less Restrictive Alternatives. We reject the suggestion that the school could utilize the method approved of in J.A., having students randomly scanned by a metal detector. The searches in J.A. were not conducted on a daily basis, or on individual students, although they did attend a regular public secondary school. In this case, the students were individuals who had already been involved in criminal offenses, and who were receiving a "last chance" to redeem themselves. The procedure utilized in J.A. would not have been adequate here.
In addition to weapons, Cornerstone had a legitimate interest in keeping drugs out of the school in order to promote a safe environment in which the students could redeem themselves and learn. A school may test for drugs because the school is responsible for maintaining the discipline, health and safety of students. Earls, at 836, 122 S.Ct. 2559. Further, a school has a legitimate concern in preventing certain students from using drugs. Vernonia.
In this case, the procedure utilized by Cornerstone was calculated to keep both weapons and drugs out of the school, and killed "two birds with one stone." Use of a metal detector, and a subsequent pat down if metal was detected, would not identify those students who only carried drugs into the school. A school is not required to utilize the least intrusive means to accomplish its goal. Vernonia. The relevant inquiry is whether the interest being protected is important enough to justify the particular search. Vernonia.
Based on the above, we find that the administrative searches conducted by Cornerstone were proper.
AFFIRMED.
ORFINGER and LAWSON, JJ., concur.
NOTES
[1] C.N.H. reserved her right to appeal, and the trial court found that the issue on the motion to suppress was dispositive, with the state agreeing. Hicks v. State, 915 So.2d 740 (Fla. 5th DCA 2005); Fla. R.App. P. 9.140(b)(2)(A).
[2] See § 985.03(15), Fla. Stat. (2005).
[3] For example, the purpose of an administrative search at the courthouse door is to deter individuals from bringing dangerous weapons into the courthouse. State v. Plante, 134 N.H. 585, 594 A.2d 165 (1991).
[4] The Florida Legislature has announced a policy of zero tolerance for crime in schools. § 1006.13, Fla. Stat. (2004).