COMMONWEALTH *vs.* ROLAND R., a juvenile.

Suffolk. December 5, 2006. - January 30, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Administrative inspection, Reasonable suspicion. *Controlled Substances.*

A Juvenile Court judge erred in allowing the juvenile's motion to suppress evidence of marijuana found in his bag after he had refused to allow the bag to be searched as he entered a court house, where the search was a justifiable administrative search to which the juvenile implicitly demonstrated his consent when he approached the security checkpoint area, placed his bag on the table, and passed through the metal detector, and the defendant could not then withdraw his consent after the inspection had commenced [281-284]; further, once the juvenile opted to terminate the security check and physically regained possession of his bag, the various officers present had reasonable suspicion to believe that the juvenile might pose a safety risk to others in and around the court house [284-285].

COMPLAINTS received and sworn to in the Suffolk County Division of the Juvenile Court Department on March 12, 2004.

A pretrial motion to suppress evidence was heard by *Marjory A. German*, J.

An application for leave to file an interlocutory appeal was allowed by *Cordy*, J., in the Supreme Judicial Court for the county of Suffolk, and the case was reported by him.

*John P. Zanini*, Assistant District Attorney (*Donald LaRoche*, Assistant District Attorney, with him) for the Commonwealth.

*David B. Poole* for the juvenile.

GREANEY, J. The juvenile in this case was charged with delinquency by reason of possession of a class D controlled substance (marijuana), possession of marijuana with intent to distribute, and possession with intent to distribute in a school zone. A judge in the Suffolk County Division of the Juvenile Court Department allowed a motion to suppress the marijuana that was seized from the juvenile's bag after the juvenile refused

to allow the bag to be searched as he entered the Dorchester District Court House (court house). A single justice of this court granted the Commonwealth leave to pursue an interlocutory appeal in this court. See Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996). We reverse the allowance of the motion to suppress.

1. A summary of the judge's (unchallenged) findings, amplified by stipulation of the parties[1] and relevant undisputed facts compiled from the record, follows. All individuals entering the court house (except for licensed attorneys or uniformed police officers) must remove items from their pockets, place them in a tray to be scanned by an X-ray screening device, and proceed through an electronic metal detector. All bags must be scanned by an X-ray device. Two signs posted at the front entrance of the court house inform those who enter that all bags are subject to a manual search.[2] A court officer of the Dorchester Division of the District Court Department, Clarence Buggs, testified, in

---

[1] We allow the Commonwealth's unopposed motion, filed pursuant to Mass. R. A. P. 2, 365 Mass. 845 (1974), and Mass. R. A. P. 8, as amended, 430 Mass. 1601 (1999), to expand the record on appeal to include the stipulation of the parties as to the substance of the testimony of Court Officer Clarence Buggs.

[2] The judge's finding that *two* signs were posted at the court house entrance, apparently, was based on her view of the court house taken at the outset of the evidentiary hearing on the motion to suppress. No transcript exists of the hearing and no photographs of the signs were admitted in evidence. Fifteen months after the judge's view was taken, and nine months after the entry of her initial findings of fact, the Commonwealth filed a motion requesting supplemental written findings of fact and rulings of law that would contain a finding that the judge had taken a view of the court house entrance that included a view of signs posted near the entry way (according to the motion's caption) on the "left hand wall, right hand wall, and desk next to x-ray machine." Attached to the motion were three photographs purporting to be of the signs referenced in the motion. The judge declined to amend her initial findings as to the number of signs (in response to the Commonwealth's implicit suggestion that she do so) when she made supplemental findings that (1) a view of the entry area of the Dorchester Trial Court was conducted as part of the hearing and (2) no pictures showing the area at the time of the view were admitted in evidence. The Commonwealth makes no specific argument to this court that the judge's finding on this point was erroneous. The juvenile, nevertheless, has filed a motion to strike those pages of the Commonwealth's appendix containing photocopies of the photographs and any references to those pages in the Commonwealth's brief. We allow the juvenile's motion. See *Commonwealth* v. *Core*, 370 Mass. 369, 371 (1976) (report attached as part of appendix to party's brief, but never admitted in evidence or otherwise made part of record,

substance, at the hearing on the motion to suppress, that the policy he followed in conducting searches of bags at the entrance to the court house was to search, not only for weapons, but also for other contraband, including drugs and food.

At about 10:40 A.M. on March 12, 2004, Court Officer Buggs was performing routine security checks on individuals at the front entrance to the court house. The juvenile approached the screening station, placed his bag on a table next to the X-ray device, and walked through the electronic metal detector. He did not set off the alarm. When informed by Court Officer Buggs that his bag was going to be searched manually, the juvenile stated that he did not want anyone to search his bag. He picked up the bag and turned to leave the building. Court Officer Buggs contacted Carlos Martinez, a Boston police officer assigned to the court house that day, and told him that the juvenile did not want his bag checked. Officer Martinez approached the juvenile, who was now on the outside steps of the court house, about seven or eight feet away from the screening station, and said, "Hey, come here."

At this point, the juvenile turned and ran. Officer Martinez yelled for him to stop and broadcast a radio call with the juvenile's description. Officer John Conway, who was on the second floor of the court house, looked out a window and observed Officer Martinez chasing the juvenile. Officer Conway went down the stairs and observed five to ten officers, all leaving the building and running in the direction the juvenile had run. Officer Conway joined in the chase of the juvenile without knowing the reason why the juvenile was being pursued. After a three to five minute chase, through yards and over fences, Officer Conway caught up with the juvenile and handcuffed him. Sergeant Detective Al Terestre, who also had joined the pursuit while unaware of the reason for it, caught up with the juvenile, gave him Miranda warnings, and asked the juvenile why he was running. The juvenile responded that he was running for "what was in the bag." Officer Terestre looked in the bag and found nineteen plastic bags of marijuana. The juvenile then was arrested. The officers did not ask the juvenile his age, and no parent was present during his questioning.

not properly before reviewing court).

.

2. We now consider the only issue presented by this case: whether the juvenile's motion to suppress the marijuana properly was allowed. We conclude, for the following reasons, that it was not.

a. The search was justified as a lawful administrative search. There is no question that area-entry inspections at court house entrances, for safety and security purposes, are permissible without a warrant or individualized suspicion of wrongdoing or danger. See *Commonwealth* v. *Harris*, 383 Mass. 655, 656-657 (1981), and cases cited. The juvenile implicitly demonstrated his consent to such an inspection when he approached the security checkpoint area, placed his bag on the table, and passed through the metal detector. The posted signs would have informed the juvenile that all bags were subject to search, and he should not have been surprised when Court Officer Buggs told him of his intention to search his bag. There is no claim, and no indication in the record, that the juvenile was singled out for individual treatment. See *id.* at 657. We conclude that the juvenile was not entitled to withdraw his consent after the inspection had commenced, at the time he became aware that a manual search of his bag would in fact take place.

To allow established court house security procedure to be manipulated in this manner would jeopardize court house safety. It would fail to prevent (and indeed could encourage) an individual from making multiple attempts to enter the court house with a bag containing a weapon or contraband, leaving each time it became apparent that the bag would be manually searched, and, finally, successfully entering the building (with the weapon or contraband) on the first instance in which the bag was not subject to a search. Requiring someone to complete the security screening, once begun, is an entirely reasonable approach to court house security procedures, reasonableness being the "touchstone" of art. 14 of the Declaration of Rights to the Massachusetts Constitution and the Fourth Amendment to the United States Constitution. See *Commonwealth* v. *Gaynor*, 443 Mass. 245, 256 (2005); *Commonwealth* v. *Silva*, 440 Mass. 772, 778 (2004). As stated in the Commonwealth's brief, "Allowing mid-stream disruptions of the screening process would undermine [the] deterrent effect [of random searches] and encourage a

deadly waiting game." Appellate courts in other jurisdictions have agreed with this position. See *United States* v. *Herzbrun,* 723 F.2d 773, 776-777 (11th Cir. 1984) (airport security checkpoint); *People* v. *Heimel,* 812 P.2d 1177, 1181-1182 (Colo. 1991) (airport security checkpoint); *State* v. *Plante,* 134 N.H. 585, 588, cert. denied, 502 U.S. 984 (1991) (security measures at court house entrance).

We reject the juvenile's arguments that this particular administrative search was unlawfully broad because security officers were permitted to search court house visitors for "food, drugs, and other contraband, in addition to seeking weapons" and impermissibly intrusive because the security staff "did not allow the juvenile to leave the courthouse rather than having his bag searched."[3] What we have said above disposes of the latter argument.[4] As for the former, the juvenile attempts to portray the security protocol at the court house as an intrusive scheme with the constitutionally unacceptable purpose of "gathering of evidence for criminal prosecutions." *Commonwealth* v. *Carkhuff,* 441 Mass. 122, 126 (2004), quoting *Commonwealth* v. *Harris, supra* at 657. The juvenile offers citations to multiple decisions (three of this court) in which recognition has been given to well-established principles that administrative searches must be as limited in their intrusiveness as is consistent with safety and security purposes and that a governmental checkpoint set up for the purpose of uncovering contraband that does not itself pose any imminent danger to others may violate the requirements for a suspicionless search under art. 14. See, e.g., *Commonwealth* v. *Carkhuff, supra*; *Commonwealth* v. *Rodriguez,* 430 Mass. 577, 583 & n.6 (2000); *Commonwealth* v. *Harris, supra* at 657. See also cases decided under the Fourth Amendment, e.g., *United States* v. *Bulacan,* 156 F.3d 963, 973-974 (9th Cir. 1998); *United*

---

[3]We do not consider the juvenile's claim that the court house procedure was unlawful because the screening protocol "allowed [Court] Officer Buggs to open the juvenile's bag and search it by hand without having first subjected it to an x-ray scan." The judge's findings are not sufficiently detailed to support this claim.

[4]Nothing that we have said, of course, should be read to suggest that the juvenile would not have been free to turn back and leave the building *before* placing his bag on the table near the X-ray device and stepping through the electronic metal detector. The juvenile could then, presumably, have stored his bag elsewhere and reentered the court house through the security checkpoint.

*States* v. *Doe*, 61 F.3d 107, 110 (1st Cir. 1995); *United States* v. *$124,570 U.S. Currency*, 873 F.2d 1240, 1247 (9th Cir. 1989). Incorporating the above cases with the testimony of Court Officer Buggs (that the policy he followed in conducting searches of bags was to search for drugs and food as well as weapons), the juvenile posits that the screening procedure at the court house fails to meet "the threshold requirement for a lawful administrative search." *Commonwealth* v. *Carkhuff, supra* at 127.

The juvenile makes the mistake of assuming, however, as established fact, that the Dorchester District Court security policy was directed to the purpose of searching for food, drugs, and other contraband. The judge made no such finding, and nothing in the record (including the stipulated-to testimony of Court Officer Buggs) supports such a finding. It is quite clear that the regulatory purpose behind security checkpoints at court house entrances, including the checkpoint at the entrance of the court house here, is to prevent, by way of deterrence or confiscation, the smuggling of weapons and other dangerous materials, such as explosives, into the building. See *Commonwealth* v. *Harris, supra* at 656-657. Such screenings are necessary protective measures and occur in substantially different circumstances from, for example, preplanned drug interdiction roadblocks that are designed, ab initio, with the general law enforcement purpose to gather evidence of undetected crimes. See, e.g., *Commonwealth* v. *Rodriguez, supra* at 584-585 & n.7, and cases cited (art. 14 prohibits roadblocks to search for contraband such as drugs).[5] That Court Officer Buggs, as a practical matter, may have routinely searched for drugs and other contraband does not render the screening process unlawful. See *Commonwealth* v. *Murdough*, 428 Mass. 760, 764-765 (1999) (officers' subjective motive does not invalidate objectively justifiable behavior).

Even were it established (it is not) that the security officers at the court house had been instructed, pursuant to court house

---

[5]We have favorably compared, however, the immediate need justifying security checkpoints at court houses and airports with the constitutionally permissible justification underlying sobriety roadblocks, set up to remove drunk drivers from the public roadways. See *Commonwealth* v. *Rodriguez*, 430 Mass. 577, 583 n.6 (2000).

policy, to look for contraband such as drugs and food, with the purpose of preventing its importation into the court house, such a policy would not automatically render the search unreasonable. The proposition that there exists a strong public interest in keeping the public buildings that house our court rooms free from illegal drug trafficking or ingestion requires no discussion. Items of food, presumably, also may be banned from a court house, for reasons of cleanliness and sanitation as well as to minimize distracting behavior during court proceedings. (The possession of food, of course, is not a criminal offense, so no recrimination can occur when it is found in a bag or closed container.) That security personnel may discover and seize illegal drugs and food items while engaging in a search primarily aimed at preventing the importation of weapons and other dangerous substances would not, by itself, contaminate with illegality an otherwise permissible administrative search. To argue otherwise is a false tautology.

b. Once the juvenile opted to terminate the security check and physically regained possession of his bag, there arose further ground on which to justify the search. Court Officer Buggs and Officer Martinez had reasonable suspicion to believe that the juvenile, whose outward reluctance to reveal the bag's contents fairly permitted the inference that his bag contained contraband of some type, might pose a safety risk to others in and around the court house. That the juvenile was leaving the building did not make him any less dangerous. It would have been unreasonable for Court Officer Buggs, as a court officer in charge of security, not to have attempted to inquire further into the matter. Officer Martinez's words to the juvenile ("Hey, come here"), arguably, did not constitute a "seizure." See *Commonwealth* v. *Stoute*, 422 Mass. 782, 789 (1996) (not every encounter between police and member of public is intrusion of constitutional dimensions requiring justification). Even assuming that they did, however, the attempt to question the juvenile further was fully justified in the circumstances.

Certainly, at the moment the juvenile began to run, there was "a reasonable suspicion, based on specific, articulable facts and reasonable inferences, that the [juvenile] had committed, was committing, or was about to commit a crime." *Commonwealth*

v. *Willis*, 415 Mass. 814, 817 (1993). "Seemingly innocent activities taken together can give rise to reasonable suspicion justifying a threshold inquiry," *Commonwealth* v. *Watson*, 430 Mass. 725, 729 (2000), and "[a]n attempt to avoid contact with or observation by the police . . . may be considered along with other facts . . . ." *Commonwealth* v. *Wren*, 391 Mass. 705, 708 n.2 (1984). Pursuit of the juvenile, therefore, was justified for constitutional purposes. See *Commonwealth* v. *Grandison*, 433 Mass. 135, 138 (2001); *Commonwealth* v. *Williams*, 422 Mass. 111, 116-117 (1996). Because the facts objectively supported a reasonable belief that the juvenile could have been armed and thus potentially dangerous, the police were warranted in handcuffing the juvenile and searching his bag. See *Commonwealth* v. *Pagan*, 440 Mass. 62, 66-73 (2003) (seizure and search of backpack within permissible limits of *Terry* pat frisk).

Contrary to what the judge (apparently) believed, the fact that the officers pursuing the juvenile were not personally aware of the circumstances leading to the chase is irrelevant. See *Commonwealth* v. *Lanoue*, 356 Mass. 337, 340 (1969); *Commonwealth* v. *McDermott*, 347 Mass. 246, 249 (1964). In determining whether police officers have reasonable suspicion for making a stop, "the knowledge of each officer is treated as the common knowledge of all officers" and must be examined to determine whether reasonable suspicion exists. *Richardson* v. *Boston*, 53 Mass. App. Ct. 201, 206 (2001).

3. The order allowing the motion to suppress is reversed, and an order denying the motion is to enter. This case is remanded to the Juvenile Court for further proceedings.

*So ordered.*