Krupp, Peter B., J.
Defendant Antoine Lewis is charged with possession of a firearm recovered shortly after 10 p.m. on June 25, 2013 in plain, flashlight-assisted view on the floor of the rear passenger side of a Lexus sedan parked at the Warren Gardens development in Roxbuiy where defendant lives. Boston police officers had seen defendant and two others exit the Lexus shortly before the firearm was recovered.
The case is before me on defendant’s Motion to Suppress Evidence (Docket #14), which seeks to suppress the fruits of the police encounter on June 25, 2013, including the firearm. Defendant characterizes the encounter as a stop under Terry v. Ohio, 392 U.S. 1 (1968), and argues the police lacked reasonable suspicion to conduct the stop. The Commonwealth contends the encounter in a neighborhood plagued by gun violence was consensual and, even if it transformed at some point into a Terry stop, the stop was supported by reasonable suspicion.
For the reasons that follow, the motion is ALLOWED. While there are legitimate law enforcement purposes for exhibiting a strong police presence in neighborhoods burdened by gun violence, as discussed below not all evidence of criminal conduct obtained through such police activity is necessarily admissible. This is particularly true if the police actions do not comply with the strictures of the Fourth Amendment to the United States Constitution or Article 14 of the Massachusetts Declaration of Rights.
FINDINGS OF FACT
After an evidentiary hearing on April 25, 2014,[1] based on the preponderance of the credible evidence, I find the following facts.
Warren Gardens in Roxbuiy is a housing development that consists of a number of cul-de-sacs and dead-end streets, with parking in most cases on both sides of the street, sufficient to accommodate at least 40-50 vehicles. In the recent past prior to the encounter in this case, the Boston police responded to Warren Gardens many times in response to 911 calls, including for gun-related activity. Boston Police Officer Donald Nicholas (“Nicholas”), who testified at the hearing on this motion, responded to the Warren Gardens area on average a few times per week over the two years that he was assigned to the Boston police district covering Warren Gardens.
In the month before June 25, 2013, two “impact players” known to associate and/or live at Warren Gardens were murdered in the area of Warren Street. Because of its histoiy, in 2012-2013, and intensifying in June 2013 after the murders, Warren Gardens was a high priority area for the Boston police and believed to be a “hotspot” for illegal activity in the city. Officers often were assigned to that area to “walk and talk” with residents in order to get to know the people who lived in the area, to be alert for the presence of people who did not live in the area, and generally to deter violence. In June 2013, as part of the increased attention paid to Warren Gardens, Nicholas and his partner, among others, would drive through the development multiple times per night when they were on duty.[2]
On June 25, 2013, at about 10 p.m., Nicholas and his partner were driving down St. Richard Street, which is a dead-end street in the Warren Gardens development. Nicholas observed a Lexus sedan, which was idling, parked head-in to the curb in front of 35 St. Richard Street. As they were passing the Lexus, they saw the silhouettes of three individuals inside. Not recognizing the Lexus, Nicholas and his partner did a computerized check on the license plate via a computer in their vehicle. As they proceeded down St. Richard Street, they learned that the Lexus was registered to a male in his 50s residing in Hingham, Massachusetts. They did not learn anything to suggest that the vehicle was unregistered, was stolen, or had been used in a crime.
Farther down St. Richard Street, Nicholas and his partner made a three-point turn to reverse directions and traveled back extremely slowly towards the Lexus. As the unmarked cruiser approached, the three occupants — two black males and a white woman — exited the Lexus.[3] Nicholas and his partner recognized the two black males to be Dashawn Williams (“Williams”), who exited the front passenger side door of the vehicle; and defendant, who exited the rear passenger side. The police knew both to associate with “impact players” in Warren Gardens. Defendant lived at 23 St. *150 Richard Street in Warren Gardens. The woman, later identified as Danielle Pecce (“Pecce”), exited the driver’s door.
There was no evidence that Williams, Pecce or defendant exited the Lexus because of the police presence or that they were even aware of the unmarked cruiser that had just passed by. Nicholas observed the driver and front seat passenger exit the Lexus calmly, while, according to Nicholas, defendant exited the rear passenger seat in a rushed and excited manner. In Nicholas’ prior dealings with defendant, which in the past had just involved informal conversation, defendant had not displayed nervousness.[4] Given the relative lack of iflumination and the fact that from his position Nicholas had to have been looking through the Lexus or other parked cars to see defendant’s actions, I do not give much weight to Nicholas’ assessment that defendant was somehow suspiciously rushed or excited while exiting the Lexus. Williams, Pecce and defendant began walking away from the Lexus in the direction of defendant’s residence at 23 St. Richard Street.
Upon seeing the three people exit the Lexus, Nicholas and his partner halted their unmarked cruiser and parked it in the street. Given the position of the unmarked cruiser, a person who had wanted to move the Lexus to leave the area would have been unable to do so. Whether intended by the police or not, the position of the unmarked cruiser prevented the Lexus from moving out of its parking spot.
As Williams, Pecce and defendant were walking away, and as Nicholas and his partner were pulling up and exiting their unmarked cruiser, Nicholas said something to the effect of “Hey, what’s up guys? What are you doing tonight?” Nicholas and his partner started walking towards Williams, Pecce and defendant. Nicholas was in plain clothes — jeans, sneakers and a t-shirt — with his Boston Police Department badge displayed in front around his neck.
Nicholas, Pecce and defendant stopped and turned around. Upon turning around, defendant had a view of the unmarked police cruiser parked behind the Lexus. The three individuals were initially about a car length away from the two police officers. Any reasonable person in defendant’s position would have known that Nicholas and his partner were police officers.
Both groups approached each other in a nonthreatening manner. The police officers attempted to engage the three individuals in conversation. Nicholas did not have his firearm displayed, nor did he remove his handcuffs. I credit his testimony that he intended to figure out who the individuals were, what they were up to, and whether anything “odd” was happening. He also intended to complete a field interrogation observation (“FIO”) report because he had not seen the Lexus in the vicinity before. See generally Commonwealth v. Lyles, 453 Mass. 811, 813 n.6 (2009) (FIO “has been described as an interaction in which a police officer identifies an individual and finds out that person’s business for being in a particular area”). At no relevant time did Nicholas tell Williams, Pecce or defendant that one or all of them were free to go. See Commonwealth v. Cao, 419 Mass. 383, 390 n.9 (“we suggest that the better practice would be for officers conducting FIOs to inform the individuals approached that the encounter is consensual and that they are free to leave at any time”), cert. denied, 515 U.S. 1146 (1995).
During Nicholas’ interactions with defendant, defendant appeared nervous, did not make eye contact, and appeared to be breathing heavily. His chest was rising and falling. Neither Williams nor Pecce exhibited similar signs of nervousness.[5] Defendant also was not giving clear answers to Nicholas’ questions. Defendant, however, took no steps to flee, did not grab at his waist or any other part of his clothing in a suspicious manner, did not conceal his hands in a suspicious manner, complied with the police officer’s instructions, was not in possession of any unusual packages, and did not throw or attempt to hide or swallow any object.
Nicholas was nonetheless curious. He asked for identification from the three individuals, which they provided. Nicholas then returned to his cruiser to determine if any of the three individuals were subject to warrants for their arrest, while his partner stayed with Williams, Pecce and defendant. Nicholas had no reason to believe that any of the three individuals had warrants out for their arrest. While in his vehicle checking for warrants, Nicholas called for additional units as backup, as he testified, “to assist us in the stop.” Nicholas called for backup because he thought something seemed “a little off.” He did not know how the three individuals would react if he inquired further of them, including whether they would attempt to flee or fight. The warrant check, which took several minutes, showed that none of the three individuals had warrants for their arrest.
After learning that none of the three individuals had warrants, Nicholas exited his vehicle, gave the identifications back to Williams, Pecce and defendant and told them they could be on their way shortly. Nicholas engaged the three individuals in informal conversation awaiting the other backup vehicles. Very soon after, other units arrived. When they did, defendant started looking around excitedly, saying words to the effect of “What did I do? I didn’t do anything. Why are they-here?”
Once backup arrived, Nicholas and his partner began talking more directly to the three individuals, asking them why they were so nervous and why they could not explain where they had been earlier. The three individuals continued to give short, quick, evasive answers.
Boston Police Officer Michael-Burke (“Burke”) and his partner were among the first individuals who *151 responded to the radio call from Nicholas for backup on St. Richard Street. Burke and his partner had been in the area on patrol. When Burke arrived, he exited his vehicle and spoke briefly with Nicholas, who was standing close to Williams, Pecce and defendant. As a result of this conversation with Nicholas, Burke removed his flashlight and began looking around inside the Lexus. He started on the driver side of the Lexus. He did not observe anything noteworthy from the windows on that side of the Lexus. He then walked in front of the vehicle to the front passenger-side window, but he saw nothing of note through that window. Then, when he looked in through the rear passenger-side window, he observed a firearm on the floor. Burke described his observations to Nicholas, who then handcuffed both Williams and defendant. All three individuals were taken into custody by the police.
DISCUSSION
The police engage with citizens every day. Not every encounter rises to the level of a Terry stop. As the Supreme Court recognized, “not all personal intercourse between policemen and citizens involves ‘seizures’ of the person. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a ‘seizure’ has occurred.” Terry, 392 U.S. at 19 n.16. Accord Commonwealth v. Narcisse, 457 Mass. 1, 5 (2010), quoting Commonwealth v. Gomes, 453 Mass. 506, 510 (2009).
A Terry stop and seizure occurs when a reasonable person in defendant’s position would believe he was not free to leave. United States v. Mendenhall, 446 U.S. 544, 553-54 (1980); Commonwealth v. Lyles, 453 Mass. at 815. See, e.g., Commonwealth v. Powell, 459 Mass. 572, 577-78 (2011) (no seizure where officers began following defendant, but “had not exercised any show of authority,” had not “commanded the defendant to stop,” and “had not blocked or impeded the defendant’s path”), cert. denied, 132 S.Ct. 1739 (2012); Commonwealth v. Smigliano, 427 Mass. 490, 491-92 (1998) (seizure where police activated blue lights).
This case involves the fluid transition and escalation of a police encounter over a short period of time. These types of encounters are undoubtedly difficult for the police. In the retrospect provided by a motion to suppress, they are also difficult for courts to discern fairly the precise moment when a casual encounter from which a citizen would reasonably believe he was free to leave transitioned to a Terry stop from which he would understand he was not.
The police did not engage with the three individuals in the Lexus when they first passed the Lexus and ran a check on its license plate. After turning around and heading back towards the Lexus, they saw three individuals get out of the Lexus, stopped their cruiser behind the Lexus, called out to the three individuals, and got out of their vehicle making clear that they were police officers. Once the three individuals turned around, there was no mistaking that the individuals calling out to them were police officers. In this context, after 10 p.m., in the dark, in an area in which the police had exhibited an active prior patrol presence, and where the police had obstructed the Lexus and disembarked from their cruiser, and with each of the black males having a history of being stopped or questioned by the police, there is a substantial question as to whether a reasonable person in the position of these three individuals would have felt that they were free to leave.[6] Cf. Commonwealth v. Narcisse, 457 Mass. at 6 (police “did not exceed the bounds of a consensual field interrogation observation when they pulled alongside the defendant and got out of their vehicle”).[7] Fortunately, to decide this motion, I do not have to resolve this question, which, in an appropriate case, might require considerable expert testimony on the psychology of living in an environment subject to the type of law enforcement scrutiny that the Boston police understandably trained on Warren Gardens in 2012-2013.
Here, upon disembarking from their unmarked cruiser, the police officers engaged the three individuals in conversation and almost immediately requested their identification. In Commonwealth v. Lyles, the Supreme Judicial Court addressed a situation like this one. There, the police requested the defendant’s identification and took it to check for outstanding warrants. As Justice Spina wrote:
By retaining the defendant’s identification to perform this task, [the police officer] was implicitly commanding the defendant to remain on the scene. At this juncture, a reasonable person would not believe that he could terminate the encounter and leave, given the importance of having identification, such as a driver’s license, to daily transactions in today’s society. A reasonable person simply would not relinquish his identification to the police and continue on with his business. Moreover, it is unlikely that a reasonable person . . . would feel free to ask for the immediate return of his identification from a police officer, regardless of whether the officer is standing next to him or several feet away in a patrol car.
453 Mass. at 815-16. See also Narcisse, 457 Mass. at 9 (“police officer may not escalate a consensual encounter into a protective frisk absent a reasonable suspicion that an individual has committed, is committing, or is about to commit a criminal offense and is armed and dangerous” (emphasis in original)).
As in Lyles, a stop occurred in this case no later than when Nicholas asked for identification to run a warrant check. At this point, a reasonable person in defendant’s position would not have felt free to leave. This conclusion is fortified by the fact that Nicholas called for backup to assist him with “the stop,” did not himself believe the three individuals were free to leave, *152 and intended to conduct further investigation, including having another officer look through the Lexus to check for evidence of any criminal activity.
This case is not like Commonwealth v. Mathis, 76 Mass.App.Ct. 366 (2010), to which the Commonwealth cites. In Mathis, the police had reason to request identification from the defendant who was seen standing in the vicinity of a “no trespassing” sign. 76 Mass.App.Ct. at 369. On the evening of June 25, 2013, Nicholas had no reason to suspect based on articulable facts that defendant was out of place in Warren Gardens, had committed any crime, or was subject to an arrest warrant. In addition, unlike in Mathis, there was no interruption of the seizure during which the individuals would have felt free to leave after their identifications were returned. Cf. id. at 370-71. To the contrary, after Nicholas returned the identifications to the three individuals, he made clear that they could not go, but would be able to leave shortly. The stop of defendant continued to allow the police sufficient time to complete their observations of the inside of the Lexus.
Whether a Terry stop is constitutional depends on the facts known to the police at the time of the stop. Commonwealth v. Roland R., 448 Mass. 278, 285 (2007); Commonwealth v. Quinn, 68 Mass.App.Ct. 476, 480-81 (2007). Here, I must look to the information known to Nicholas. The question is whether, based on articulable facts and specific reasonable inferences, the officer had a reasonable suspicion that any of the three people who got out of the Lexus was committing, had committed or was about to commit a crime. Commonwealth v. Bostock, 450 Mass. 616, 619 (2008); Commonwealth v. Silva, 366 Mass. 402, 405-06 (1974). “The facts and inferences underlying the officer’s suspicion must be viewed as a whole when assessing the reasonableness of his acts.” Commonwealth v. Thibeau, 384 Mass. 762, 764 (1981). Amere hunch or good faith belief will not be sufficient. Rather, the information known to the officer must support an objective and particularized basis to conclude that a crime has been, is being or is about to be committed. Commonwealth v. Walker, 443 Mass. 867, 872 (2005); Commonwealth v. Clark, 65 Mass.App.Ct. 39, 43-44 (2005). While “(sjeemingly innocent activities” when viewed together may support an objective finding of reasonable suspicion, Commonwealth v. Watson, 430 Mass. 725, 729 (2000), it is not enough that a person is in “a high crime area,” “nor is walking away from police officers” sufficient. Commonwealth v. Grandison, 433 Mass. 135, 139 (2001).
I find the police did not have reasonable suspicion to stop any of the three individuals who exited the Lexus. The police had no information of any criminal activity or planned criminal activity by any of the individuals involved. While the three individuals were in an area that was under heavy police patrol and considered a “high crime area,” such presence does not give the police reasonable suspicion to believe that the people found there had committed or were going to commit a crime. Nor did defendant’s outward appearances provide reasonable suspicion. There are many reasons a person may be nervous at 10 p.m. on a summer evening when approached by the police in a high crime area.
In considering whether Nicholas had reasonable suspicion, it bears asking the question: “what crime did the police have reasonable suspicion to believe defendant had committed or was about to commit based on the articulable facts known to him?” Any answer Nicholas would give to such a question would be complete speculation at the time he initiated the stop or at any time during the stop prior to the observations of the firearm inside the Lexus.[8]
ORDER
Defendant’s Motion to Suppress Evidence (Docket #14) is ALLOWED.

Atthe hearing, the Commonwealth called two witnesses. After the hearing, I allowed the parties’ request for leave to submit additional authorities in support of their respective positions by April 28, 2014. I received and have reviewed additional materials from the Commonwealth and the defense. See Docket #s 19, 20.

See, e.g., Daniels. Nagin, “Deterrence in the Twenty-First Century,” 42 Crime & Just. 199, 237-38 (2013); Anthony A. Braga, David M. Hureau & Andrew V. Papachristos, ‘The Relevance of Micro Places to Citywide Robbery Trends: A Longitudinal Analysis of Robbery Incidents at Street Comers and Block Faces in Boston,” 48 J. Res. Crime & Delinq. 7, 9 (2011); Lawrence W. Sherman and David Weisburd, “General Deterrent Effects of Police Patrol in Crime ‘Hot Spots’: A Randomized, Controlled Trial,” 12 Just. Q. 625, 645-46 (1995).

There was no evidence of whether the Lexus continued to idle or was turned off before the individuals exited.

Nicholas knew defendant had previously been convicted of a firearm-related offense and had previously served time in custody. There was no testimony as to whether that prior conviction was recent.

Williams had been the subject of at least four FIO reports in the year prior to this incident. Twice (on August 25, 2012 and September 20, 2012) Williams had been stopped by officers, including Nicholas, and frisked. Nicholas completed the FIO report on both of those encounters. On the other two occasions in which another police officer completed an FIO report (January 12, 2013 and June 14, 2013), Williams had also been frisked.

The reasonable person standard does not posit a reasonable person in a hypothetical situation, in a predominantly white affluent suburb, or on a busy commercial street at noon. The question is whether a reasonable person in the defendant’s position and under all the circumstances presented, including those presented by the actions of the police, would have felt free to leave. See Florida v. Bostick, 501 U.S. 429, 437 (1991) (“the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would ‘have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business’ ”). The reasonable person standard, which “is objective and ‘presupposes an innocent person,’ ” United States v. Drayton, 536 U.S. 194, 202 (2002), quoting Florida v. Bostick, 501 U.S. at 437-38 (emphasis in original), does not require a court wholly to disregard the *153 reality of interactions on the street. It is difficult to imagine innocent young black males in Boston at 10 p.m. on a summer evening in a neighborhood like Warren Gardens, which was receiving substantial scrutiny and repeated patrols by the Boston Police Department, feeling free to disregard a police inquiry in the setting presented by this case; at least not without some consequences. See, e.g., David Person “Black parents fret over what to tell sons,” USA Today (July 14, 2013), available at http://www.usatoday.com/stoiy/opinion/2013/07/14/david-person-on-bla ck-parents-and-sons/2516381/ (last accessed Apr. 28, 2014); Nat Hentoff, ‘What Black Parents Are Still Telling Their Children” (Aug. 12, 2009), available at http://www.cato.org/publications/commentary/what-bla ck-parents-are-stlll-telling-their-children (last accessed Apr. 28, 2014); Robert V. Ward, “Consenting to a Search and Seizure in Poor and Minority Neighborhoods: No Place for a ‘Reasonable Person,’ ” 36 How. L.J. 239, 241, 245-48 (1993).

In contrast to Narcisse, here the officers pulled their vehicle up and parked so that they blocked egress by the Lexus.

The Commonwealth cites Commonwealth v. Motto, 424 Mass. 117, 123-24 (1997), for the proposition that the firearm was legally seized under the automobile exception to the warrant requirement. See Commonwealth’s Opposition to Defendant’s Motion to Suppress (Docket # 18) at 1. What this argument misses is that probable cause is a prerequisite to a warrantless search based on the exigent circumstances associated with an automobile. Id. at 122. As I have found, the police lacked reasonable suspicion to conduct a Terry stop. They certainly lacked probable cause to search the vehicle.